**E.F. HUTTON MORTGAGE CORPORATION, Plaintiff,**

v.

**EQUITABLE BANK, N.A., Defendant.**

**EQUITABLE BANK, N.A., Counter–Plaintiff,**

v.

**E.F. HUTTON MORTGAGE CORPORATION and E.F. Hutton Group, Inc., Counter–Defendants.**

**Civ. No. H–86–2541.**

United States District Court, D. Maryland.

Jan. 25, 1988.

Howard R. Hawkins, Jr., David R. Kittay, Robert M. Horkovitch and Cadwalader, Wickersham & Taft, New York City and Phillips P. O'Shaughnessy and Sandbower, Gabler & O'Shaughnessy, P.A., Baltimore, Md., for plaintiff and counter-defendants.

John Vanderstar, Coleman S. Hicks and Covington & Burling, Washington, D.C. and Michael D. Colglazier, John H. Culver, III and Miles & Stockbridge, Baltimore, Md., for defendant and counter-plaintiff.

ALEXANDER HARVEY, II, Chief Judge.

On December 17, 1987, Michael H. Clott was sentenced by Judge Smalkin of this Court to 12½ years imprisonment, pursuant to Clott's pleas of guilty in two separate cases to charges of fraud and racketeering. *United States v. Clott*, Criminal No. S–87–0190 and *United States v. Clott*, Criminal No. S–87–0313. Clott had been Chairman and Chief Executive Officer of First American Mortgage Company, Inc. (hereinafter "FAMCO"). Operating through FAMCO, Clott had during the years 1983–1985 defrauded both large and small corporate institutions as well as countless numbers of individuals.

In sentencing Clott, Judge Smalkin observed that

the scope of the fraud which was perpetrated is one of the largest brought to prosecution in the federal system in this District. It involved victims ranging from the biggest and most sophisticated financial institutions in this ... country to people ... who lost their total life savings.... I am hard pressed to think of a more wide-ranging fraudulent scheme.

Clott's massive frauds have spawned this suit involving two large financial institu-tions as well as numerous other civil actions filed in this Court.[1] FAMCO ceased business operations in November of 1985. Shortly thereafter, FAMCO and its numerous subsidiaries filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for this District. With Clott himself devoid of funds and now in prison and with FAMCO and its subsidiaries in bankruptcy, defrauded corporations and individuals are seeking in the suits now pending in this Court to recoup the substantial losses suffered by them as a result of Clott's criminal activities.

In this particular case, E.F. Hutton Mortgage Corporation (hereinafter "Hutton") has sued Equitable Bank, N.A. (hereinafter "Equitable"), and Equitable in turn has filed a counterclaim against Hutton. Both Hutton and Equitable had business relations with FAMCO during the years before its demise. Hutton advanced funds to FAMCO for the origination of mortgage loans, purchased loans from FAMCO and sold many of them to its customers throughout the nation. Equitable was FAMCO's banker and extended credit to FAMCO for its operations. Both Hutton and Equitable have suffered substantial losses, and each is attempting in this suit to salvage from the other what it has lost.

Pretrial proceedings have been extensive. Each side has engaged in full discovery, and numerous discovery and other rulings have previously been made by the Court. Presently before the Court are two motions. Hutton and E.F. Hutton Group, Inc. (hereinafter "Hutton Group"),[2] have filed a motion for summary judgment as to Equitable's counterclaim. Equitable in turn has filed a motion to dismiss or for summary judgment as to all counts of the amend-

---

1. Civil actions pending in this Court and arising out of Clott's fraudulent activities include, in addition to this suit, the following: *E.F. Hutton Mortgage Corporation v. FAMCO*, Civil No. H–85–4671; *Yankee Bank for Finance and Savings v. Equitable Bank*, Civil No. H–85–4708; *First Federal Savings & Loan Association of Brainerd v. Equitable Bank*, Civil No. H–86–301; *Equitable Bank v. E.F. Hutton Mortgage Corporation*, Civil No. H–86–786; *Pioneer Federal Savings & Loan Association v. Equitable Bank*, Civil

No. H–86–3531; *E.F. Hutton Mortgage Corp. v. Pappas*, Civil No. H–87–552; *Equitable Bank v. First State Insurance Company*, Civil No. H–87–1318; *Zolfaghari v. Clott*, Civil No. H–87–2633.

2. E.F. Hutton Group, Inc. was the parent corporation of E.F. Hutton Mortgage Corporation and has been named in Equitable's counterclaim as a counter-defendant.

ed complaint. Memoranda and numerous exhibits and affidavits have been filed in support of and in opposition to the two pending motions. Oral argument has been heard in open Court.

For the reasons to be stated herein, both motions will be granted. Summary judgment will be entered in favor of defendant Equitable as to all claims asserted against it by plaintiff Hutton in the amended complaint. Summary judgment will be entered in favor of counter-defendants Hutton and Hutton Group as to all claims asserted against them by Equitable in its counterclaim. After an exhaustive review of the massive record in this case, this Court has concluded that the substantial losses sustained by Hutton and by Equitable were caused essentially by Clott's fraudulent conduct and not by the tortious or other wrongful acts of the opposing party.

## I

### Background

FAMCO is a Maryland corporation with its principal place of business in Baltimore. At the time of the matters in suit, Clott, a resident of Maryland, owned 51% of the common stock of FAMCO. For its own account and through its wholly-owned subsidiaries, FAMCO was in the business of lending money and taking as security second and third mortgages on borrowers' residences. These were extremely high risk loans which were made to individuals with poor credit backgrounds. FAMCO charged very high rates of interest in addition to servicing fees. The annual interest rate on a FAMCO loan was often 18% per annum, and fees charged by FAMCO often amounted to 20% or more of the face amount of the loan.

Plaintiff Hutton is a Delaware corporation with its principal place of business in Little Rock, Arkansas. Defendant Equitable is a nationally chartered banking association with its principal place of business in Baltimore. As a part of its business operations, Hutton purchased mortgage loans and then sold them to investors in the form of participation certificates and whole loan sales.

In 1983, Arthur F. Mueller, then President of Hutton, met with executives of FAMCO to discuss a business arrangement between these two firms. An agreement was later reached between FAMCO and Hutton whereby the latter would purchase mortgages originated by FAMCO. In time, plaintiff Hutton became the largest single purchaser of loans originated by FAMCO. FAMCO used money furnished by Hutton to make additional loans.

As a part of the arrangement with Hutton, FAMCO agreed to service mortgages which it had originated and which had been sold to Hutton. A subsidiary was formed, FAM Mortgage Servicing, Inc. (hereinafter "FAM Servicing"), which had the responsibility of servicing loans purchased by Hutton. FAM Servicing was responsible for collecting monthly mortgage payments from borrowers and remitting the payments to Hutton and other investors who had purchased the loans.

Before reaching its agreement with Hutton, the necessary funds for FAMCO's loans were supplied by Equitable pursuant to a line of credit extended to its customer FAMCO. Numerous bank accounts in FAMCO's name were maintained at Equitable, and between 1983 and 1985, Equitable loaned millions of dollars to FAMCO. At various times during this period, Hutton was the principal entity which provided funds for FAMCO to lend to borrowers, and at other times Equitable was the primary source of these funds.

Commencing in early 1984, FAMCO encountered problems with its servicing operations. An agreement was then reached between Hutton and FAMCO whereby the latter would service Hutton's mortgages pursuant to a program called "Mortgage Backed Security Servicing" (hereinafter "MBS Servicing"). Under this agreement, FAMCO would forward monthly principal and interest payments due on all loans sold to Hutton, whether or not FAMCO had received monthly payments from the borrowers.

In early 1985, Hutton became concerned as to its business relationship with FAMCO

and decided to drastically reduce its inventory of FAMCO loans. This decision resulted in serious cash flow problems encountered by FAMCO, which turned back to Equitable to secure funds for its operations. In mid–1985, there were even discussions between FAMCO and Equitable as to the possible acquisition by the Bank of the Clott business entities. However, investigations by Equitable of FAMCO's books and records disclosed irregularities which led to a termination of these discussions.

Meanwhile, Clott had been engaging in various types of fraudulent activities. Many mortgages were double sold. A mortgage would be sold to Hutton and included in its portfolio and thereafter FAMCO would sell the same mortgage to another institution or individual. In addition, FAMCO did not remit prepayments of mortgage loans to Hutton as required by the arrangement between the parties. When a borrower would, as permitted by the mortgage, prepay the amount due on the loan, FAMCO would often keep the amount received for operating purposes, and would continue to remit to Hutton merely monthly payments as if the mortgage were still in existence.

Various misrepresentations were made by Clott to Hutton. Hutton was told that the delinquency rate of mortgages sold to it was no more than 10 or 12%, while in fact the delinquency rate was in excess of 30%. Matters came to a head in the fall of 1985. With Hutton having restricted its purchase of mortgages from FAMCO, and with Equitable having declined to extend further credit to Clott and his various entities, FAMCO soon ran out of operating capital. On November 15, 1985, FAMCO ceased operations at mid-day. That same day, Hutton sued FAMCO, Clott and some 20 of FAMCO's subsidiary and affiliated corporations. *E.F. Hutton Mortgage Corporation v. First American Mortgage Company, Inc., et al.*, Civil No. H–85–4671. Shortly thereafter, bankruptcy proceedings were commenced.[3] This action

against Equitable was filed by Hutton on August 13, 1986.

## II

### The Claims

In its amended complaint, Hutton has asserted 15 different claims against Equitable. Four claims are based on alleged violations by Equitable of various provisions of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. § 1961 *et seq.* (Counts I–IV). Four claims are based on allegations of fraud. (Counts V, VIII, XII and XIV). In four other counts, Hutton seeks a recovery based on allegations of breach of trust and fiduciary duty by Equitable. (Counts VI, VII, X, XIII). There are also claims based on theories of partnership (Count XI), conversion (Count IX), and negligence (Count XV).

There are thirteen counts in Equitable's counterclaim. Equitable alleges seven violations by Hutton of RICO (Counts I–VII); five claims are based on allegations of fraud (Counts VIII, IX, XI–XIII), and there is one claim of negligent misrepresentation (Count X).

Both the amended complaint and the counterclaim contain a veritable laundry list of legal theories whereby each party seeks to establish civil liability on the part of the other. But try as it might, neither party has been able to cram the facts here into any viable legal theory which would permit a recovery against the other. Voluminous discovery has been undertaken. However, exhaustive development of the facts concerning Clott's massive fraudulent activity and his business dealings with each of the parties here has not produced credible evidence of actionable wrongdoing by either Equitable or Hutton. The losses sustained by both the plaintiff and the defendant in this case were caused either by Clott's fraudulent and criminal activities or by ill-advised business decisions made by Hutton or Equitable.

---

3. By Order of the Bankruptcy Court dated July 31, 1986, the Chapter 11 proceedings have now been converted to Chapter 7. *In Re First Ameri-* can *Mortgage Company, et al.,* Bankruptcy No. 85–B–1987.

There is little doubt that Hutton and Equitable were each in bed with FAMCO, albeit a different bed. Each during the later stages of their business dealings with FAMCO began to have suspicions concerning Clott, but each failed to make at a sufficiently early date the necessary investigations and business decisions which would have reduced their financial commitments and their ultimate losses. Once committed to doing extensive business with Clott, each hesitated to call a halt to their dealings, knowing that the result would be FAMCO's bankruptcy. It was apparent to both Hutton and Equitable that the cessation of FAMCO's business operations would result in substantial losses.

In seeking to salvage something from the losses resulting from Clott's fraud and the collapse of his business enterprise, both plaintiff and defendant have accused the other of knowingly participating in Clott's fraudulent activities. Although the allegations have been made and extensive discovery has been undertaken, the facts of record do not show that either Hutton or Equitable were guilty of tortious or other wrongful acts. In this suit, therefore, neither one is entitled to a recovery from the other.

### III

#### Summary Judgment Principles

One of the purposes of Rule 56 is to require a plaintiff (or a defendant asserting a counterclaim), in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant or opposing party may be liable under the claims alleged. *See* Rule 56(e). Moreover, "a mere scintilla of evidence is not enough to create a fact issue, there must be evidence on which a jury might rely." *Seago v. North Carolina Theaters, Inc.,* 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967) quoted in *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984). In the absence of such a minimal showing, a defendant (or a plaintiff defending a counterclaim) should not be required to undergo the considerable expense of preparing for and participating in a trial. As Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two recent cases, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 106 S.Ct. at 2511–12. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral

part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 2555.

The Fourth Circuit recently discussed in *Felty v. Graves–Humphrey Co.*, 818 F.2d 1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent factually unsupported claims and defenses from proceeding to trial." *Felty*, 818 F.2d at 1128 (citing *Celotex, supra*, 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court concludes that defendant's motion for summary judgment must be granted as to all counts of the amended complaint, and that counter-defendants' motion for summary judgment must be granted as to all counts of the counterclaim.

### IV

*Facts Pertaining to Hutton's Claims*

On or about December 13, 1983, Hutton entered into an agreement with FAMCO whereby Hutton agreed to purchase various mortgage loans originated by FAMCO and its subsidiaries. Pursuant to this agreement, Hutton purchased from FAMCO insured mortgage loans which contained fixed terms and fixed rates of interest and which were secured by residential real estate. FAMCO agreed to provide Hutton periodically with various informa-tion and schedules identifying the status of each loan purchased by Hutton. FAM Servicing was to service the mortgage loans owned by Hutton, including collecting principal and interest due and arranging for foreclosures of mortgages in default. FAMCO guaranteed Hutton that FAM Servicing would perform properly.

During the early part of 1984, FAMCO and Hutton orally agreed to modify the earlier agreement. Rather than continue to submit separate monthly principal and interest payments to Hutton when received, FAMCO agreed to make monthly payments pursuant to the so-called MBS Servicing plan. Under that arrangement, FAMCO paid Hutton on a monthly basis the total amount of monthly principal and interest due, whether or not the funds had been actually received by FAMCO from borrowers.

MBS Servicing was important for both FAMCO and Hutton. Hutton became less concerned about defaults because Hutton every month was to receive and did receive from FAMCO the full amount due from the borrowers whether or not there were delinquencies or defaults. MBS Servicing in turn permitted FAMCO to avoid reorganization of its loan servicing operations, which were in considerable disarray. As long as FAMCO paid Hutton the proper monthly amounts due, Hutton had little interest in the accompanying paperwork.

When viewed in hindsight, it is apparent that the MBS Servicing arrangement was a key factor in FAMCO's ability to defraud Hutton. FAMCO's loans were extremely risky, and the default and delinquency rates on FAMCO-originated loans were high. As a result of FAMCO's monthly payments, Hutton did not know of the defaults and high delinquency rate. As long as funds from various sources continued to flow into FAMCO, FAMCO had the where-withal to make monthly payments to Hutton. Once Hutton decreased its purchases and Equitable refused to provide new funds, FAMCO's Ponzi-type scheme collapsed.[4]

---

4. FAMCO's failure to remit to Hutton the pay-ment due in late October 1985 led directly to

FAMCO maintained various bank accounts at Equitable. Except for one such account, all of the FAMCO bank accounts at Equitable were ordinary demand deposit checking accounts. Hutton itself had no bank accounts at Equitable which related to any FAMCO transactions, and Hutton did not keep funds received from FAMCO in any Equitable account.[5]

To facilitate his fraudulent activities, Clott from time to time transferred money to and from various FAMCO bank accounts. Some of these transfers were to cover overdrafts in some of the accounts. Discovery in this case indicates that substantial amounts of money eventually ended up in Clott's own hands for his personal use. Although the record indicates that Equitable knew that there were overdrafts and that FAMCO had transferred money between various accounts, it further shows that Equitable had no reason to believe that the overdrafts involved fraud of any kind or that the FAMCO transfers were improper or that Clott was in any way defrauding it or Hutton.

In November of 1983, Equitable had approved a $3 million line of credit for FAMCO. During internal Equitable discussions concerning whether to approve this extension of credit to FAMCO, an Equitable executive had noted that in the event FAMCO went bankrupt and ceased originating new loans, FAMCO might be faced with a high default rate for loans outstanding. In spite of this observation by one of its executives, Equitable made the business decision to grant FAMCO the $3 million line of credit. These facts hardly establish that Equitable knew at this early date that FAMCO was defrauding Hutton and others. Indeed, had Equitable known of Clott's fraudulent activities, it would hardly have continued to extend credit to FAMCO.

In March of 1984, FAMCO sought a substantial increase of its line of credit with Equitable. Equitable reviewed FAMCO's books and records and found various irregularities and disorganization in the manner in which FAMCO kept its books. Before agreeing to increase FAMCO's line of credit, Equitable wanted an assurance that FAMCO would be able to continue to find buyers for all of the loans it originated. Undoubtedly, Equitable, as a means of shoring up FAMCO's financial stability, wanted Hutton, the largest purchaser of FAMCO loans, to continue to make and even expand such purchases. Accordingly, Equitable limited any further extension of credit to FAMCO to $2 million unless FAMCO could persuade Hutton to agree to expand its purchases of FAMCO loans. The record does not indicate that this 1984 extension of credit to FAMCO was part of any fraudulent scheme on the part of Equitable to induce Hutton to purchase all FAMCO originated loans.

In August of 1984, Hutton agreed to provide FAMCO with all funding for the origination of loans. In exchange, FAMCO gave Hutton the right to purchase any and all FAMCO originated loans which Hutton might select. Prior to this agreement, executives from Hutton, FAMCO and Equitable met to discuss Hutton's potential expanded business relationship with FAMCO. Mueller, President of Hutton, testified at his deposition that because of the cordiality of the meetings, he had the "impression" that Equitable was satisfied with its banking relationship with FAMCO. Another Hutton executive, James Benedum, testified at his deposition that it was also his "impression" that Equitable was satisfied with its banking relationship with FAMCO. There is no evidence in this record to indicate that Equitable ever made any affirmative misrepresentations to Hutton concerning its business relationship with FAMCO.

In July of 1984, Equitable loan officer Thomas Polvinale had left Equitable to work for FAMCO. Hutton relies on two

---

Hutton's review of FAMCO's books and records and the closing of FAMCO's doors on November 15, 1985.

**5.** There was an account labelled "FAM Mortgage Servicing, Inc. Custodial Account for E.F. Hutton" which was opened in August of 1985 at an Equitable branch with a $1 deposit and which saw no activity thereafter.

**576**

pieces of evidence in support of its argument that Polvinale learned about the FAMCO fraud and conveyed his knowledge to his former Equitable colleagues. An Equitable loan officer, John Myers, testified at his deposition that Polvinale told him that FAMCO had received $358,000 in prepaid loans, but that the money had not been remitted to the owners of the loans. Hutton argues that Polvinale's disclosure to Myers proves that Equitable, through Myers, knew of Clott's fraudulent activities. However, Myers also testified at his deposition that "[i]t would not be unusual for [$358,000 due purchasers] to appear on a financial statement" because such a notation would mean merely that FAMCO had an account payable of $358,000. Myers' testimony does not support Hutton's argument that Equitable knew in 1984 about the FAMCO fraud.

Hutton also relies on the deposition testimony of a former FAMCO employee. Timothy Hastings, who was employed at FAMCO at or about the same time as Polvinale, testified that he told some six other FAMCO employees, including Polvinale, about the ongoing FAMCO fraud. Although Polvinale did maintain contact with his former Equitable colleagues, there is nothing in the record to indicate that Polvinale told any one at Equitable that FAMCO was engaging in fraudulent activities. Polvinale was indeed appalled by FAMCO's disorganization, and he clearly became dissatisfied with his new position at FAMCO. But there is no indication that he had actual knowledge of Clott's fraudulent activities and that he told Equitable executives about the fraud.

FAMCO loans were insured against borrower defaults by Rockwood Insurance Company (hereinafter "Rockwood"). FAMCO maintained one account at Equitable referred to as the FAM SIRF Fund Account.[6] This particular account, despite its name, was merely a demand deposit account. Another SIRF account, the so-called SIRF Escrow Account, was adminis-

tered by the Bank's Trust Department as part of the FAMCO–Rockwood agreement.

On April 25, 1985, Equitable reported to FAMCO investors that the SIRF Escrow Account contained $1,006,000 in cash and $1,020,000 in mortgage notes. Equitable's John Myers noticed that $85,000 of the notes held by Equitable appeared to be photocopies and that the $1,020,000 figure represented the face value and not the current value of the notes. Because Myers knew that Equitable reported the balance of the SIRF Escrow Account to investors like Hutton, Myers asked his supervisor, William Norwood, whether qualifying language should be inserted in the report to describe more accurately the actual value of the notes. On May 5, 1985, Norwood told Myers that the description of the notes had been changed and that

"[a]s Escrow Agent, we have no responsibility to determine the adequacy of the SIRF assets but are simply to receive deposits into the account, invest cash under limited guidelines and make disbursements only upon the joint order of FAMCO and Rockwood Insurance Company."

Hutton does not contend that Equitable had a duty to report to Hutton the contents of the SIRF Escrow Account. Nor does Hutton claim that Equitable permitted transfers from the SIRF Escrow Account in violation of Equitable's duty as escrow agent. Rather, Hutton argues that the Myers–Norwood conversations indicate participation by Equitable in Clott's fraudulent activities. But Myers did no more than question the reporting of the value of the notes contained in the SIRF Escrow Account. The report was essentially accurate. The mere fact that Equitable did not state in the report that the notes were listed at face value rather than at actual value is hardly a misrepresentation of a material fact. There is no indication that Equitable had any motive or intent to mislead Hutton and other investors. On the contrary, Myers and Norwood took steps to clarify any possible misunderstanding

6. FAMCO made small deposits for each loan into a Self Insured Retention Fund (SIRF), to be used for repayment of defaulted loans. Once

SIRF was depleted, Rockwood would make payments under its policy.

which might have resulted from a reading of the report by an investor.

In 1984, FAMCO was audited by the accounting firm of Ernst & Whinney. Harry Pappas was the Ernst & Whinney partner in charge of the audit. On April 1, 1985, Pappas left Ernst & Whinney to become Chief Financial Officer at Equitable. Hutton argues that Pappas knew about the FAMCO fraud because Ernst & Whinney had discovered various bookkeeping irregularities at FAMCO as a result of the 1984 audit. However, Hutton can point to no evidence indicating that the discovery of bookkeeping irregularities by Ernst & Whinney in 1984 constituted discovery of the massive fraud being perpetrated by Clott. Indeed, Hutton itself became aware of FAMCO's bookkeeping deficiencies at an early date but failed to monitor and continually audit FAMCO's books and records after it entered into the MBS Servicing arrangement.

During the spring and summer of 1985, Equitable pursued negotiations with Clott concerning the Bank's possible acquisition of FAMCO. As part of this contemplated acquisition, Equitable and Ernst & Whinney conducted a "due diligence" investigation of FAMCO. As a result of this investigation, Equitable discovered various irregularities in FAMCO's bookkeeping. Some Equitable employees even suspected that FAMCO's activities were fraudulent. Instances were discovered whereby FAMCO had not forwarded loan prepayments to investors. One of Equitable's employees testified at his deposition as follows:

> I think before we [considered notifying the authorities], we met with the bank's attorneys, and they indicated that there would have to be some fairly considerable research to determine whether in fact what FAMCO had done constituted a legally fraudulent act.

Equitable informed attorney Andre Brewster, a partner in the Baltimore law firm of Piper and Marbury, about FAMCO's possibly fraudulent activities. Brewster advised Equitable that FAMCO's conduct might be fraudulent, and that Piper & Marbury would not represent Equitable if Equitable chose to pursue the acquisition of FAMCO.

█ What the record shows here is that Equitable suspected, but did not have concrete knowledge that FAMCO may have been engaged in fraudulent activity. But Equitable had no duty to inform Hutton of its suspicions. Hutton and Equitable had no contractual or other relationship which would have required Equitable to tell Hutton what it may have known about Clott's operations.

During the summer of 1985, there were continuing discussions between Equitable and FAMCO concerning the possibility of an acquisition. However, no agreement was ever reached, and there is no evidence in the record to indicate that any one from Equitable falsely represented to Hutton that a partnership existed between Equitable and FAMCO. Clott himself allegedly stated to Hutton that, except for formalities, the business combination was a "done deal." But this was only one of many misrepresentations made by Clott to Hutton.

On various dates in October and November of 1985, after completion of the due diligence investigation and after indications of possible fraud on the part of FAMCO came to light, Equitable loaned $1.9 million to FAMCO. Carl Stearn, President of Equitable, testified at his deposition that Equitable knew that FAMCO was in serious financial trouble, but loaned FAMCO money in an effort to keep FAMCO solvent. It is apparent that this eleventh hour infusion of funds was insufficient as FAMCO filed bankruptcy proceedings a few weeks later. Certain Equitable loan officers did indeed object to the October and November 1985 loans. Equitable, however, decided to make the loans to FAMCO based on new collateral, including mortgages held by Equitable in its FAMCO portfolio and a confessed judgment note executed by Clott and his wife individually. Whether or not it was imprudent for Equitable to loan an additional $1.9 million to FAMCO at this late date, there is no evidence in this record indicating that the loan was made with an

intent to defraud or for any other improper purpose.

Indeed, Hutton can hardly complain that it was injured as a result of Equitable's eleventh hour loan, the purpose of which was to forestall FAMCO's bankruptcy. As will be discussed hereinafter, Hutton itself in 1985 had considerable doubt concerning FAMCO's ability to continue its business operations and itself purchased additional loans in that year for the express purpose of keeping FAMCO afloat until a new source of FAMCO funding could be found. Hutton and Equitable each pursued the same unsuccessful business strategy. Each, at some time during 1985 and before FAMCO's bankruptcy, wanted to end its business relationship with FAMCO. However, each knew that if it abruptly stopped providing funding, FAMCO would go bankrupt. Besides providing new funding during the last few months of FAMCO's existence, each party here welcomed the other's contributions to FAMCO which would aid FAMCO in continuing its business operations.

Hutton further relies on the deposition testimony of a FAMCO employee, Timothy Hastings. After Hastings told an Equitable employee, John Balzarini, in November, 1985 that some of the mortgage notes sold to Equitable were held by other investors as well, Balzarini said, "Keep this information quiet for now until we can figure out what to do." Hutton contends that this evidence establishes that Equitable knew that FAMCO was engaged in fraudulent activity. However, the inference is refuted by other portions of the testimony of this FAMCO employee. Hastings further testified that Balzarini was surprised to learn that Equitable did not have the original notes for mortgage loans held by it. Balzarini would hardly have expressed surprise, if as Hutton argues, Equitable had known about and participated in the FAMCO fraud for a considerable period of time.

In any event, besides telling Hastings to keep the information "quiet for now," Balzarini (according to Hastings) also said that there must be some kind of misunderstanding. Balzarini pointed out that Equitable owned the loans, and that if FAMCO did not promptly remit necessary principal and interest payments to Equitable, Balzarini would inform Clott of the misunderstanding. These statements refute Hutton's contention that Equitable was Clott's longtime partner in the FAMCO fraud. The record here establishes that Equitable, like Hutton, was a victim of, and not a participant in, the FAMCO fraud.

■ The Hastings–Balzarini conversation occurred in November of 1985. By that time, Hutton was not purchasing mortgages from FAMCO because of Hutton's discovery of suspicious conduct of Clott. Thus, any knowledge of fraud on the part of Equitable at that late date is not relevant to Hutton's claim for damages since no further damages were sustained by Hutton after November of 1985.

From 1983 through 1985, Clott diverted large sums of money from FAMCO bank accounts at Equitable for his own personal use. It is quite apparent from all the discovery in this case that Clott used the FAMCO bank accounts at Equitable to facilitate his criminal fraud. Equitable did suspect in 1985 that there might be wrongdoing by Clott. However, the evidence in this record does not establish either that Equitable knew that Clott was defrauding it or Hutton, or that Equitable had any duty to tell Hutton what it had learned, or that there was any participation in any fraud by Equitable, thus causing Hutton to purchase loans from FAMCO.

■ Hutton points to facts in the record indicating that it had no knowledge of the FAMCO fraud. These facts support a finding not only that Hutton may not have known of the FAMCO fraud, but also, more importantly, that Hutton did not rely upon any false representations or fraudulent conduct of Equitable. Hutton may well have decided to continue its business relationship with FAMCO because Equitable, a substantial financial institution, was FAMCO's banker. Conversely, Equitable continued to provide banking services to FAMCO because it knew that Hutton was FAMCO's largest customer and was purchasing

millions of dollars worth of risky mortgages from FAMCO. Neither knew that the other was being defrauded by Clott. Diligent investigation of the books and records of Clott's companies by Hutton at any early date should have revealed that fraud was being perpetrated. But Hutton did not take this prudent step until it was too late.

Hutton cites the following facts to prove its lack of knowledge of the FAMCO fraud: (1) that Mueller, because of his past experience of working with FAMCO, believed that FAMCO could properly service the loans owned by Hutton; (2) that Hutton believed in 1984 and 1985 that FAMCO was substantially improving its operations, (3) that Polvinale's move from Equitable to FAMCO could be viewed as an endorsement of FAMCO's future, (4) that Hutton could properly rely on the fact that FAMCO's new servicing manager, O'Reilly, had decades of mortgage servicing experience; (5) that FAMCO had been audited by Ernst & Whinney, an established accounting firm; and (6) that Hutton could reasonably rely on the 1984 Ernst & Whinney audit of FAMCO and could expect that an unqualified 1985 audit of FAMCO was forthcoming. Hutton asserts that it had no knowledge of FAMCO's fraudulent activities even though FAMCO failed to submit delinquency reports to Hutton as required by the Hutton–FAMCO agreement, and even though Hutton never exercised its contractual right to audit FAM Servicing, and even though Hutton knew that FAMCO was each month advancing its own funds to Hutton in anticipation of making collections from borrowers.

The facts support Hutton's contention that it had no knowledge of FAMCO's fraud until November of 1985. But they also establish that Hutton did not rely upon any alleged misrepresentations of Equitable when Hutton expanded its business relationship with FAMCO. Rather, the record here shows that Hutton relied on circumstances unrelated to Equitable when it made the costly decision to continue and even expand its business relationship with FAMCO.

## V

### *Hutton's Claims*

### (a)

### General Principles

Eight of the fifteen counts of the amended complaint are essentially based on the contention of plaintiff Hutton that defendant Equitable had knowledge of Clott's fraudulent activity and that such knowledge and Equitable's participation in the fraud proximately caused the substantial losses sustained by plaintiff. This contention forms the basis of the four counts alleging fraud and of the four counts alleging RICO violations.

■ In its memoranda and oral argument, Hutton consistently and repeatedly asserts that Equitable had knowledge of fraud. The short answer to this contention is that Equitable owed no duty to Hutton concerning what it may or may not have known about Clott and his business operations. Even were it to be assumed that Equitable had the knowledge attributed to it by Hutton (and the Court has concluded herein that no such knowledge existed on the critical dates involved in this case), Equitable had no duty to disclose such knowledge to Hutton.[7] It has long been established under Maryland law that nondisclosure does not constitute fraud unless there exists a duty of disclosure. *Impala Platinum v. Impala Sales*, 283 Md. 296, 323, 389 A.2d 887 (1978); *Equitable Trust Company v. G & M Construction Corp.*, 544 F.Supp. 736, 743–44 (D.Md.1982). No fiduciary relationship existed between Hutton and Equitable and thus even had Equitable known of Clott's fraudulent conduct, there was no duty to disclose such knowledge to Hutton.

Moreover, what Equitable may have known or may have done was not the proximate cause of the substantial losses sustained by plaintiff Hutton. It was not Eq-

---

7. Counsel for Hutton conceded during oral argument that if Hutton had learned of FAMCO's fraud during the summer of 1985, it had no duty to inform Equitable of what it had learned.

uitable's conduct which actually produced the substantial injury to Hutton, but rather the massive fraud perpetrated by Clott through his various companies. *See Schwartzbeck v. Loving Chevrolet, Inc.*, 27 Md.App. 139, 339 A.2d 700 (1975). The essential inquiry insofar as causation is concerned is whether a defendant's conduct has caused the plaintiff's harm. *See* Prosser, *The Law of Torts* § 41 at 240 (3d ed. 1964) and *Restatement Second of Torts* §§ 430–433 (1965). On the record here, plaintiff Hutton cannot meet its burden of showing that any act or failure to act of Equitable caused its losses.

### (b)

### The Fraud Claims

Count V of the amended complaint seeks a recovery under a theory of common law fraud. To prove a claim of fraud under Maryland law, Hutton must establish by clear and convincing evidence: (1) that Equitable made a false representation; (2) that Equitable knew that the representation was false; (3) that the representation was made for the purpose of deceiving Hutton; (4) that Hutton reasonably relied upon Equitable's false representation; and (5) that Hutton suffered damage resulting directly from Equitable's fraudulent representation. *See e.g., Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982).

■ The proof here falls far short of establishing these essential elements of the alleged tortious conduct. There is insufficient evidence as a matter of law in this record to indicate that Equitable knew that Hutton was being defrauded by FAMCO. Equitable did know, as did Hutton, of irregularities in FAMCO's operations, and some of its employees may have suspected that Clott was engaged in fraudulent conduct. But knowledge of bookkeeping irregularities of a depositor or suspicions of a few employees of a large banking institution are not the equivalent of knowledge that another party doing business with the bank's depositor is being defrauded. Equitable itself was being defrauded by FAMCO at the same time as was Hutton. Had Equitable known what Hutton claims it did

know, Equitable would hardly have continued a substantial business relationship with Clott and his companies, including advancing almost $2 million shortly before bankruptcy proceedings were commenced.

Hutton argues that there were misrepresentations made by representatives of Equitable during certain meetings held in 1984 attended by executives of Hutton, of FAMCO and of Equitable. But the "impressions" of Mueller and Benedum that Equitable was satisfied with its banking relationship with FAMCO hardly constitute a misrepresentation of a fact by Equitable. Mueller and Benedum may indeed have properly anticipated the fact that Equitable intended to continue its banking relationship with FAMCO. Equitable was presumably satisfied with its business dealings with FAMCO since it later loaned substantial additional sums to FAMCO for the continuation of the latter's business. It would hardly have made any sense for Equitable to continue to do business with Clott if it knew that it was being defrauded.

■ Since there is no merit to Hutton's claim of fraud, summary judgment must likewise be granted as to Count VIII of the amended complaint, which alleges that Equitable aided and abetted FAMCO in its scheme to defraud Hutton. Relying upon cases decided under securities laws, Hutton contends that it need prove merely three elements to sustain under Maryland law the claim asserted in Count VIII, as follows: (1) primary fraud by the principals; (2) the aider's knowledge of or reckless disregard of the possibility of primary fraud; and (3) the aider's substantial assistance of the primary fraud. *See Martin v. Pepsi–Cola Bottling Co.*, 639 F.Supp. 931, 934 (D.Md.1986). Even were this Court to assume that *Martin* applies to claims based on common law fraud as well as to claims based on securities fraud, there is no evidence in the record that, as required by *Martin*, Equitable acted with a conscious intention to facilitate or advance FAMCO's scheme for the purpose of defrauding Hutton. *Id.* (If defendant has no duty of disclosure, plaintiff must prove "conscious

intent.") Not only has no knowledge on the part of Equitable been proven, but also there is a failure of proof that Equitable participated in Clott's fraudulent activities.

■ Similarly, there is no merit to Hutton's claim of civil conspiracy asserted in Count XII. Under Maryland law, a civil conspiracy is a combination of two or more persons seeking by agreement or understanding to accomplish an unlawful act with resulting damages. *Green v. Washington Suburban Sanitary Commission,* 259 Md. 206, 221, 269 A.2d 815 (1970). The proof here does not disclose that Equitable had knowledge of Clott's illegal undertakings nor that Equitable knowingly performed one or more overt acts in furtherance of the FAMCO fraud. Knowledge by a bank of overdrafts or of the transfer by a depositor of funds from one bank account to another to cover overdrafts is insufficient to amount to knowledge of fraud and hardly in this case constitutes an overt act by Equitable in furtherance of such fraud.

■ Finally, constructive fraud, as alleged in Count XIV, has likewise not been proved. The key element in the definition of constructive fraud under Maryland law is a breach of a legal or equitable duty. *Scheve v. McPherson,* 44 Md.App. 398, 406, 408 A.2d 1071 (1979). Moreover, constructive fraud requires clear and convincing proof and is not lightly found by the courts. *Id.* at 406–07, 408 A.2d 1071. Summary judgment is appropriate as to Count XIV because there is no evidence here that defendant Equitable breached any legal or equitable duty owed to plaintiff Hutton.

### (c)

### The RICO Claims

Counts I, II, III and IV of the amended complaint allege claims under RICO. These claims are all based on predicate acts of fraud allegedly committed by defendant Equitable.

■ Clearly, if plaintiff Hutton cannot prove fraud on the part of Equitable, its RICO claims must also fail.[8] *See Lavay Corporation v. Dominion Federal Savings & Loan Association,* 830 F.2d 522, 529 (4th Cir.1987). Since the fraud claims of plaintiff Hutton must fail, summary judgment must likewise be granted in favor of defendant Equitable as to all of plaintiff's claims asserted under RICO.

### (d)

### The Breach of Fiduciary Duty Claims

Four counts of the amended complaint seek recoveries under various theories of alleged breach of fiduciary duty by defendant Equitable. Count VI alleges that Equitable knowingly participated with FAMCO in a breach of fiduciary duty; Count VII asserts that Equitable violated the Maryland Uniform Fiduciaries Act; Count X alleges that Equitable itself breached fiduciary duties owed to Hutton and Count XIII is based on the contention that Equitable breached a constructive trust. All four of these claims for breach of fiduciary duty rest on two underlying premises. First, Hutton claims that Equitable violated various duties owed to Hutton arising under the 1983 SIRF Escrow Agreement entered into by Equitable, FAMCO and Rockwood. Second, it is contended that Equitable violated various duties owed to Hutton under the provisions of the Maryland Uniform Fiduciaries Act, Md.Est. & Trust Code Ann. § 15–201 *et seq.* (1974) (hereinafter the "UFA").

In August of 1983, FAMCO entered into an agreement with its insurer, Rockwood, the purpose of which was to provide for means whereby FAMCO would be compensated for borrower defaults. Equitable was a party and agreed to act as escrow agent under the arrangement between FAMCO and Rockwood.

Hutton was not a party to this escrow agreement. Furthermore, Hutton was not, as argued, an assignee. None of the parties intended that Hutton should be an assignee, and no duty was owed by Equitable to Hutton under the SIRF Escrow Agreement. The fact that Hutton purchased

---

**8.** Counsel for Hutton so conceded during oral argument.

mortgage loans from FAMCO did not make Hutton an assignee of rights under this agreement.

Relying on *Restatement (Second) of Trusts*, § 2(b) (1959), Hutton argues that Equitable owed it a fiduciary duty under the agreement because Equitable knew that Hutton was one of the beneficiaries. No such wide-ranging and open-ended fiduciary duty as contended by Hutton existed here. There is no evidence in the record that the parties to the escrow agreement intended to create a trust for the benefit of Hutton. The terms of the agreement were intended to benefit only FAMCO and Rockwood or some other party to which rights under the agreement had been formally assigned.

■ Hutton's reliance on *Century Indemnity Company v. State of Maryland*, 144 F.Supp. 671 (D.Md.1956) is misplaced. That case involved the fiduciary duty arising when a real estate broker is in possession of money deposited by a purchaser. The parties to the real estate transaction in that case manifested an intention that the broker would hold the purchaser's deposit in trust for various beneficiaries pending the completion of the sale. No such duty was assumed by Equitable under the circumstances of this case. Accordingly, Hutton is not entitled to any recovery as a result of the alleged violation by Equitable of duties imposed by the 1983 SIRF Escrow Agreement.

■ Under the UFA, Hutton would be entitled to recover damages resulting from FAMCO banking transactions conducted by Equitable if (1) Equitable had a duty to Hutton; and (2) Equitable conducted the transactions either with actual knowledge that FAMCO was misappropriating funds or with knowledge of facts indicating that its own actions in connection with the transactions amounted to "bad faith." Md. Est. & Trust Code Ann. §§ 15–206 and 15–208. However, as previously noted, Equitable had no knowledge that FAMCO was engaging in fraudulent activity in drawing checks on its various accounts. Nor was Equitable in possession of facts indicating that in permitting FAMCO to draw on the accounts, it (Equitable) was acting in bad faith.

In discussing this claim of Hutton in their memoranda, both parties rely on *Maryland Casualty Company v. Bank of Charlotte*, 340 F.2d 550 (4th Cir.1965). In *Maryland Casualty*, an employee of Southern Investment Company defrauded her employer of some $18,000. Maryland Casualty Company, having issued a fidelity bond, reimbursed Southern for its loss and then sued the Bank of Charlotte, claiming that the bank had violated the UFA. In finding the bank liable, the Court in *Maryland Casualty* relied on the fact that the bank had permitted the employee to pay off personal debts to the bank for a period of 2–½ years by drawing on her employer's business account. The Court found that the bank had actual knowledge of the employee's misappropriation and acted in bad faith by not investigating whether the employee was misappropriating Southern's funds.

The facts here are quite different. Hutton had no business relationship with Equitable, whereas in *Maryland Casualty*, the bank clearly owed a duty to its depositor. In *Maryland Casualty*, the bank permitted the depositor's employee to draw on her employer's account and use the funds to repay the bank for personal loans. No such facts are present in this case. Equitable had no duty to monitor for Hutton's benefit withdrawals by FAMCO from its various bank accounts.

Hutton further contends that money in the FAMCO bank accounts actually belonged to it and that therefore Equitable owed it a duty. Clearly, the funds in FAMCO's account were not "owned" by Hutton or any other purchasers of mortgages but were merely deposits made by FAMCO in bank accounts maintained at Equitable. Deposition testimony of Equitable employees relied upon by Hutton does not support Hutton's contention that funds in these accounts belonged to Hutton and not to FAMCO. Such funds were not in Hutton's possession and control when they were in FAMCO's bank account at Equitable. FAMCO may have been collecting money

for Hutton and may have owed money to Hutton, but the funds in question did not belong to Hutton as argued by plaintiff.

▇▇▇ In the absence of a banking relationship between the parties, Equitable owed no duty to Hutton under the UFA. Since Equitable did not know of Clott's fraudulent activity and since Equitable did not act in bad faith, Hutton is not entitled to a recovery based on its allegations that defendant Equitable violated the UFA.

Hutton argues that Equitable acted in bad faith because it was unjustifiable for Equitable to disregard and refuse to learn facts readily available. *See Maryland Casualty, supra* at 554. But if Equitable should have known about the FAMCO fraud, so should have Hutton. Both parties were aware of irregularities in FAMCO's business operations. However, neither was in possession of significant evidence of actual fraud before November of 1985, and neither was prepared before then to stop doing business with Clott and his various companies. The evidence here does not indicate that Equitable acted in bad faith by disregarding and refusing to learn facts readily available to it.

For all these reasons, summary judgment will be entered in favor of defendant Equitable as to all claims of plaintiff Hutton based on allegations of breach of fiduciary duty.

### (e)

### The Partnership Claim

In Count XI, plaintiff Hutton asserts that defendant Equitable was a partner with FAMCO and is therefore responsible for the latter's fraudulent acts. Hutton cannot and does not contend that FAMCO and Equitable entered into a formal partnership agreement. Rather, Hutton argues that Equitable and FAMCO were operating as and intended to operate as a partnership or joint venture.

▇▇▇ The record is devoid of facts which would support Hutton's claim under Maryland partnership law. In June of 1985, Equitable did sign a letter of intent concerning its possible acquisition of FAMCO. Prior to that time, the parties had clearly

not been operating either actually or constructively as a partnership or joint venture. Equitable's proposed acquisition of FAMCO was expressly made contingent upon completion of a "due diligence" investigation by Equitable and approval of the acquisition by appropriate regulatory authorities. The contingencies were never met, and the letter of intent was withdrawn. Since Equitable and FAMCO at no time operated as partners or pursuant to a joint venture agreement, plaintiff is not entitled to any recovery under Count XI.

### (f)

### The Negligence Claim

▇▇▇ In Count XV of the amended complaint, plaintiff Hutton seeks damages because of the alleged negligence of Equitable in failing to discover FAMCO's fraud. As previously noted, Equitable owed no duty to Hutton arising as a result of the improper conduct of FAMCO. Furthermore, Equitable's alleged failure to act was not a proximate cause of the substantial losses suffered by plaintiff Hutton. In a State like Maryland which has adopted the UFA, mere negligence on the part of a bank in failing to detect a fiduciary's wrongdoing is not actionable. *See e.g., Colby v. Riggs National Bank,* 92 F.2d 183, 194 (D.C.Cir.1937); *Research–Planning, Inc. v. Bank of Utah,* 690 P.2d 1130, 1132 (Utah 1984).

For these reasons, summary judgment will be granted in favor of defendant Equitable as to plaintiff's claim of negligence.

### (g)

### The Conversion Claim

▇▇▇ Other than conclusory allegations contained in the amended complaint, Hutton has not explained and has not supported or substantiated its claim of conversion alleged in Count IX. Conversion is an intentional tort. *See Keys v. Chrysler Credit Corp.,* 303 Md. 397, 414, 494 A.2d 200 (1985). The record here is totally devoid of facts indicating that Equitable acted intentionally to deprive Hutton of the use of any property. The funds in FAM-

CO's bank accounts did not belong to Hutton, and Equitable did not know of nor participate in Clott's fraudulent activity. Summary judgment will thus be granted in favor of Equitable as to Count IX.

## VI

### *Facts Pertaining to Equitable's Counterclaim*

As of January 1985, Hutton owned a large inventory of FAMCO originated loans. Beginning in early 1985, a review of Hutton's operations was ordered by executives of the parent of Hutton Group. This review was led by Andrew Selden. Selden learned in early 1985 that the paperwork accompanying the FAMCO originated loans was in total disarray. Selden concluded that there were significant business risks associated with Hutton's resale of FAMCO originated loans to Hutton customers.

Selden instructed the Internal Audit Division of the Hutton companies (hereinafter the "IAD") to investigate the activities of its subsidiary Hutton in an effort to determine whether FAMCO was complying with the terms of the FAMCO–Hutton agreement. The IAD discovered that FAMCO was not complying with the terms of the agreement. In particular, IAD learned in February of 1985 (1) that FAMCO possibly was not making its required deposits to the SIRF escrow account, (2) that insurance certificates were missing from many of the FAMCO originated loan files, and (3) that various other irregularities existed with respect to FAMCO originated loans.

In late February of 1985, Hutton decided to decrease and eventually terminate its business relationship with FAMCO. However, Hutton did not want to act immediately, because if it abruptly stopped purchasing loans from FAMCO, it was apparent that FAMCO would be financially unable to continue its business operations and would be unable to continue servicing the substantial quantity of FAMCO loans that Hutton or its customers already owned. Moreover, a bankrupt FAMCO could not, as it had agreed to do, repurchase from Hutton loans that did not comply with the terms of the agreement between Hutton and FAMCO.

For some time, Hutton had been the primary purchaser of FAMCO loans. If Hutton completely stopped buying mortgages from FAMCO, FAMCO would immediately have to find alternative purchasers. FAMCO was at the time making remittances to Hutton under the MBS Servicing arrangement, whether or not full payments were being made by the mortgagors. FAMCO depended upon new funds received from new loan originations to enable it to make monthly payments to Hutton. A Selden memorandum of March 1, 1985 stated:

"If we put [FAMCO] out of business, they will not be able to service the loans we have sold to investors and that will create a major problem."

It was thus in Hutton's interest to extricate itself from its relationship with FAMCO without forcing FAMCO into bankruptcy. To achieve this goal, Hutton in the spring of 1985 engaged in a two part strategy. First, Hutton decided to continue purchasing FAMCO loans until FAMCO was able to obtain an alternative source of funding. Second, Hutton began pressuring FAMCO into finding an alternative source of funding.

At different times during 1985, Hutton and Equitable each became aware of FAMCO's serious financial problems, yet each continued to do business with FAMCO and fund its operations. Hutton and Equitable both decided that because of their substantial financial involvement, a FAMCO which was continuing to operate was far better for each of them than a bankrupt FAMCO.

Hutton and Equitable accordingly each provided funding for FAMCO during the last several months of its existence so that this distressed business enterprise might be kept afloat. The motivation of each party was not any attempt to defraud the other; rather, it was a business decision undertaken in an attempt to minimize losses which each saw in the offing.

At some time between March 1, 1985 and June of 1985, Hutton came to the realization that FAMCO's financial situation was probably hopeless. Hutton had learned of

various irregularities associated with FAM-CO's servicing of loans. Furthermore, FAMCO had reneged on its promise to repurchase defective loans from Hutton. Nevertheless, Hutton continued to purchase loans from FAMCO. Although Equitable admits that it never purchased any FAMCO loans from Hutton, Hutton's continuing purchases of such loans and its sale of loans to third parties forms the basis for Equitable's contention in its counterclaim that it was defrauded by Hutton.

Hutton was pleased to learn in 1985 about Equitable's proposed acquisition of FAMCO. One Hutton memorandum stated:

> "the bank will [then] be providing their lines of credit, reducing our future fundings."

Another Hutton memorandum stated:

> "we were finally able to get out of the contract with FAMCO to buy the product ... after the originator, FAMCO, had found an alternate source of financing for its current production."

Hutton was obviously anxious for FAMCO to find alternative sources of funding. Only then would Hutton be able to decrease its purchases from FAMCO and still not force FAMCO into bankruptcy. However, as discussed hereunder, these facts are hardly evidence that Equitable was defrauded by Hutton.

## VII

### Equitable's Counterclaim

### (a)

### General Principles

Equitable's counterclaim is in thirteen counts. There are five counts alleging fraud, seven counts alleging RICO violations and one count alleging negligent misrepresentation.

All of Equitable's claims are based on alleged fraudulent schemes. The first such alleged scheme is the "sale of mortgage loan" scheme, as set forth at Paragraphs

18 through 36 of Equitable's counterclaim. It is there alleged that Hutton fraudulently induced institutions other than Equitable to purchase mortgage loans from it and FAMCO at inflated prices and that Equitable was thereby injured. The second alleged scheme is the so-called "source of funding" scheme, alleged in Paragraphs 37 through 51 of Equitable's counterclaim. It is there asserted that Hutton fraudulently induced Equitable to expand its business dealings with FAMCO with the result that Equitable eventually replaced Hutton as FAMCO's primary source of funding.

In its Memorandum and Order filed in this case on August 10, 1987, this Court, *inter alia*, denied Hutton's motion to dismiss the counterclaim.[9] This Court there concluded that in its counterclaim Equitable had alleged essential elements of its RICO claims and of its fraud claims so as to permit the case to go forward on the basis of these allegations. In its ruling, the Court noted that this suit involved a commercial dispute and that each side for tactical reasons had charged the other with RICO violations. Although both sides had properly alleged RICO claims, the Court stated that it would determine at a later date whether sufficient facts existed to support the claims made and whether sanctions should be imposed under Rule 11, F.R.Civ.P.

Equitable's counterclaim has even less merit than the claims asserted by plaintiff Hutton in the amended complaint. Like Hutton, Equitable is attempting to recoup losses sustained as a result of Clott's fraudulent activities by suing another party which did business with Clott. But Hutton, even if it had knowledge in early 1985 of Clott's fraud, had no duty to disclose this information to Equitable. Like Hutton's losses, those sustained by Equitable were caused by Clott's fraudulent activities and not by any tortious or other wrongful conduct of the opposing party.

---

**9.** However, certain paragraphs of the counterclaim alleging a third fraudulent scheme were stricken.

### (b)

### The Fraud, Conspiracy and Negligent Misrepresentation Claims

In Count VIII of the counterclaim, Equitable seeks a recovery from Hutton and Hutton Group under a theory of common law fraud. The elements of common law fraud under Maryland law were discussed hereinabove in Part V (b) of this Opinion.

Equitable has failed to meet its burden as to several essential elements of its claim of fraud. Since it can point to no misrepresentations made by Hutton, Equitable relies on "non-verbal conduct" whereby Hutton allegedly poured millions of dollars into FAMCO in order to represent to Equitable that FAMCO was a viable and legitimate entity. Equitable argues that such conduct caused harm to it because, relying thereon, Equitable extended further credit to FAMCO without knowing the latter's true financial situation.

■ Although non-verbal conduct may under certain circumstances constitute a misrepresentation, the facts here do not support Equitable's claim for fraud. No evidence exists to indicate that Hutton continued to purchase FAMCO loans with the intent that such purchases be construed as a representation to Equitable of FAMCO's financial viability. Rather, as discussed hereinabove, Hutton continued to purchase mortgage loans from FAMCO because otherwise FAMCO would not have had sufficient operating funds to continue in business. Equitable can point to no evidence in the record indicating that it justifiably relied upon any misrepresentation of Hutton made by way of non-verbal conduct. Proof of actionable fraud on the part of Hutton is thus missing in this record. A claim of fraud similar to the one asserted by Equitable in this case was dismissed by the court in *Catalina Yachts v. Old Colony Bank and Trust Co.*, 497 F.Supp. 1227 (D.Mass.1980).

■ Fraudulent inducement has likewise not been proven. The tort of fraudulent inducement is established when one has been led "by another's guile, surreptitiousness, or other form of deceit to enter into an agreement to his detriment." *Security Construction Company v. Maietta*, 25 Md.App. 303, 307, 334 A.2d 133 (1975). Since the record here does not show that deceit of any kind was practiced by Hutton, summary judgment must be entered in favor of plaintiff Hutton as to Count XII.

■ Count IX alleges that Hutton aided and abetted in FAMCO's fraud, and Count XIII asserts that Hutton aided and abetted in fraudulent inducement. Count XI of the amended complaint seeks a recovery under a theory of civil conspiracy. To succeed in proving all three of these claims, Equitable must show that plaintiff Hutton knowingly participated in FAMCO's fraud. As discussed herein, there is no evidence that Hutton knew about FAMCO's fraud, that it participated in such fraud, that it acted with reckless disregard concerning such fraud or that it performed one or more overt acts in furtherance of the fraud.

For all these reasons, defendant Equitable is not entitled to a recovery under Counts IX, XI, XII and XIII.

Under Maryland law, the elements which a plaintiff must prove to succeed under a theory of negligent misrepresentation differ only slightly from those required to prove fraud. *See Martens Chevrolet v. Seney, supra*, 292 Md. at 337, 439 A.2d 534. Under a claim of fraud, there must be proof that the defendant intended to deceive the plaintiff while a claim of negligent misrepresentation requires merely proof that the defendant negligently deceived the plaintiff.

■ In this case, it is not necessary to consider whether Hutton acted negligently, because Equitable cannot prove the other elements of the tort. As discussed hereinabove, evidence does not exist that Hutton made a misrepresentation of any kind to Equitable nor is there evidence that Equitable relied to its detriment on any representation of Hutton. Accordingly, summary judgment in favor of the counter-defendants will be granted as to Equitable's claim of negligent misrepresentation asserted in Count X of the counterclaim.

### (c)

### The RICO Claims

Counts I—VII inclusive of the counterclaim allege claims under RICO. As did Hutton in the amended complaint, Equitable in its counterclaim bases its RICO claims on predicate acts of fraud allegedly committed by plaintiff Hutton.

■ As discussed herein, this Court has concluded that Equitable cannot prove that Hutton engaged in or participated in fraudulent activity. Accordingly, Equitable's RICO claims must also fail. *See Lavay Corporation, supra.* Summary judgment will therefore be granted in favor of the counter-defendants as to all RICO claims asserted by Equitable in its counterclaim.

### VIII

### *Rule 11 Sanctions*

In its Memorandum and Order filed in this case on August 10, 1987, this Court specifically warned the parties to this suit concerning the requirements of Rule 11, F.R.Civ.P. This Court noted that each side in this case for tactical reasons had charged the other with RICO violations. Each side was advised that if a motion for summary judgment were filed challenging one or more of the RICO counts asserted by the opposing party, counsel in responding to such a motion should keep the standards of Rule 11 in mind. The Court further observed that in a proper case, RICO can be applied to a civil action for damages but that a RICO claim should not be pressed in a case if the facts developed by discovery disclosed that its concepts did not apply and that the RICO claim had accordingly been alleged for an improper purpose.

An attorney has a duty to conduct a pre-filing examination of both the facts and the law before instituting legal process. *NCNB National Bank v. Tiller,* 814 F.2d 931, 941 (4th Cir.1987). A standard of objective reasonableness should be applied. *Id.* at 941. During the pendency of a case, counsel have a continuing obligation to review and re-evaluate the claims they have asserted in the light of the facts developed by discovery. *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir. 1987). As the Court said in that case (at 1127):

> Thus, a document that initially satisfies the requirements of rule 11 may later turn out to be the basis for rule 11 sanctions as new facts are discovered which show that there is no longer a good faith basis for the document. Upon discovering that a good faith basis no longer exists, it is incumbent upon the appropriate counsel and party to take necessary actions to ensure that the proceedings do not continue without a reasonable basis in law and fact. (Footnote omitted).

■ On this record, this Court concludes that both sides have violated Rule 11. Whether or not the filing of the amended complaint or of the counterclaim was a violation of Rule 11 insofar as the RICO claims were concerned, the RICO claims should not have been pursued once the motions for summary judgment were filed. In opposing defendant's motion for summary judgment addressed to plaintiff's RICO claims, counsel for Hutton could hardly have believed from any review of the facts developed by way of discovery that Hutton's RICO claims were well grounded in fact. Similarly, in opposing plaintiff's motion for summary judgment as to the RICO claims asserted in the counterclaim, counsel for Equitable could hardly have believed on this record that the claims in question were well grounded in fact. Extensive discovery has revealed the weakness of claims of fraud asserted by plaintiff in the amended complaint and by defendant in the counterclaim. When the deficiencies of the fraud claims came to light, a good faith basis could hardly have existed for pressing the RICO claims, which, for survival, required much more extensive proof than the fraud claims.

Under Rule 11, if a pleading is signed in violation of the Rule, the Court on its own motion may require the payment to the other party of the amount of the reasonable expenses incurred including a reasonable attorney's fee. In this particular case, both parties are at fault insofar as the

RICO claims of each are concerned. Were one or the other to have conceded that its RICO claims lacked merit, the Court would have imposed sanctions on the other party. However, since both are at fault, little would be gained if defendant were paid sanctions by plaintiff and if in turn plaintiff were paid sanctions by defendant.

Nevertheless, the Court will take this opportunity to express its extreme displeasure that counsel on both sides, after being expressly warned, persisted in making misuse of RICO concepts in a case which involves no more than a commercial dispute. As amended in 1983, Rule 11 was designed to streamline the litigation process by lessening frivolous claims or defenses. *Blair v. Shenandoah Women's Center, Inc.*, 757 F.2d 1435, 1437 (4th Cir.1985). In this particular case, counsel on both sides, by continuing to press their RICO claims for tactical reasons, have placed unnecessary burdens both on the Court and on opposing counsel. Since each side is equally at fault, no sanctions will be imposed.

## IX

### *Conclusion*

For the reasons stated, defendant's motion to dismiss or for summary judgment, treated herein as a motion for summary judgment, will be granted as to all counts of the amended complaint, and counter-defendants' motion for summary judgment will be granted as to all counts of the counterclaim. Judgment will be entered in favor of defendant on the amended complaint, and judgment will be entered in favor of the counter-defendants on the counterclaim. An appropriate Order will be entered by the Court.