**E.F. HUTTON MORTGAGE CORPORATION, Plaintiff,**

v.

**Harry G. PAPPAS, Jr., et al., Defendants.**

**Civ. No. H–87–552.**

United States District Court, D. Maryland.

June 28, 1988.

Howard R. Hawkins, Gregory M. Petrick, Grant B. Hering and Cadwalader, Wickersham & Taft, New York City, and Phillips P. O'Shaughnessy, P.A., Baltimore, Md., for plaintiff.

Wilbur D. Preston, Jr., Gerard J. Gaeng, and Whiteford, Taylor & Preston, Baltimore, Md., and Daniel F. Kolb and Davis, Polk and Wardwell, Washington, D.C., for defendants.

ALEXANDER HARVEY, II, Chief Judge.

This civil action is one of the many suits which have been filed in this Court as a result of the massive fraudulent activity of Michael H. Clott, formerly Chairman and Chief Executive Officer of the bankrupt First American Mortgage Company, Inc. (hereinafter "FAMCO"). In its Opinion recently filed in *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*, 678 F.Supp. 567 (D.Md.1988) (hereinafter "the *Equitable* Opinion" or "the *Equitable* case"), this Court discussed in some detail Clott's fraudulent and criminal activity which caused substantial losses to those firms and persons having business dealings with FAMCO.

In the *Equitable* case, E.F. Hutton Mortgage Corporation (hereinafter "Hutton") sued FAMCO's bank, Equitable Bank, in an attempt to recoup the losses suffered by it as a result of Clott's fraudulent and criminal acts. In the *Equitable* Opinion, this Court concluded, *inter alia,* that the losses sustained by Hutton were caused by Clott's fraudulent and criminal activities or by its own ill-advised business decisions. 678 F.Supp. at 572. Summary judgment was accordingly granted in that case in favor of Equitable as to the amended complaint and

in favor of Hutton as to Equitable's counterclaim. 678 F.Supp. at 588.[1]

In this case, Hutton has sued partners of Ernst & Whinney (hereinafter "E & W"), a national accounting firm engaged by FAMCO in 1984 to do certain accounting work for it.[2] Both Hutton and E & W had business relations with FAMCO during the years 1984 and 1985.

As noted in the *Equitable* Opinion, FAMCO was in the business of originating mortgage loans and thereafter selling those loans in the secondary market. Hutton was the largest purchaser of FAMCO-originated loans, and bought more than $100 million of such loans from January of 1984 through June of 1985. As a result of fraudulent and criminal conduct on the part of FAMCO and Clott,[3] many of the loans purchased by Hutton have proven to be either worthless or worth substantially less than their purchase price. Reference is hereby made to the background facts recounted in some detail in the *Equitable* Opinion. Such facts are pertinent for an understanding of the claims and defenses presented in this particular case.

Extensive discovery has been undertaken by the parties during pretrial proceedings in this case, and various discovery rulings have previously been made by the Court. Presently before the Court is defendants' motion for summary judgment and for the imposition of sanctions pursuant to Rule 11, F.R.Civ.P. Memoranda and numerous affidavits and exhibits have been filed in support of and in opposition to the pending motion.[4] Oral argument has been heard in open Court.

For the reasons to be stated herein, defendants' motion for summary judgment will be granted, and defendants' motion for the imposition of sanctions will be denied. As it determined in the *Equitable* case, the Court, after carefully reviewing the extensive record in this particular case, has concluded that Hutton's losses were caused by Clott's fraudulent and criminal activities and by Hutton's own negligent acts and not by any tortious act of E & W.

## I

### *Facts*

On December 13, 1983, Hutton and FAMCO executed an agreement (hereinafter "the 1983 Purchase Agreement"), whereby Hutton agreed to purchase $2,000,000 of mortgage loans originated by FAMCO. Among various other provisions, the 1983 Purchase Agreement required FAMCO to service the loans which it was selling to Hutton and to furnish Hutton periodically "with its most current published financial statements as requested."

On December 16, 1983, Hutton and FAMCO executed a servicing agreement (hereinafter "the 1983 Servicing Agreement"). FAMCO, as servicer of the loans owned by Hutton, was required to deposit all funds collected from debtors into bank trust accounts which were to be "carried in the name of Servicer [FAMCO] as Trustee for Holder [Hutton]." If a borrower repaid his mortgage in full, the 1983 Servicing Agreement required FAMCO to transfer said funds to Hutton "within five business days following the day of prepayment." With respect to monthly principal and interest payments, FAMCO was required to remit said funds to Hutton "[o]n or before the twentieth day of each calendar month." The 1983 Servicing Agreement also required FAMCO to provide Hutton with monthly delinquency reports and with its financial statements, as follows:

Within ninety (90) days after the close of each calendar year, or if Servicer con-

---

1. Both parties appealed from rulings made by the Court in that Opinion. These cross-appeals were recently dismissed by agreement pursuant to Rule 42(b), F.R.A.P.

2. Nineteen partners of Ernst & Whinney are named as defendants in this case.

3. Clott is presently serving a 12½ year prison term imposed by Judge Smalkin of this Court.

4. A number of the affidavits filed by plaintiff, including an affidavit of plaintiff's attorney, do not comply with the requirements of Rule 56(e) and have not been considered by the Court in its determination of the pending motion for summary judgment.

ducts its business on a fiscal year other than the calendar year, then within ninety (90) days after the close of Servicer's fiscal year, Servicer shall furnish Holder financial statements compiled in accordance with Generally Accepted Accounting Principles, showing its assets and liabilities and the general nature of same, which statement shall bear the certificate of a reputable, independent certified public accountant showing the extent to which such accountant has audited Servicer's books and records and showing such financial statement to be correct.

1983 Servicing Agreement at Par. 15.

Shortly after entering into the 1983 Servicing Agreement, FAMCO retained E & W to perform an audit of its financial statements. E & W was retained to audit FAMCO's financial statements for the 1984 fiscal year ending on February 29, 1984, and FAMCO provided E & W with a copy of its 1983 Servicing Agreement. The audit work was done by E & W, and FAMCO received a copy of its audited 1984 fiscal year financial statements on or about August 22, 1984. Hutton received a copy of the audited statements in late August or early September of 1984. By that time, Hutton had already purchased or decided to purchase some $26 million of FAMCO-originated loans.

Hutton had made its first purchase of FAMCO mortgage loans in January of 1984. Soon thereafter, Clott informed Arthur F. Mueller, President of Hutton, that FAMCO was unable to properly service the loans which it had sold to Hutton. An agreement was then reached between Hutton and FAMCO which modified the 1983 Servicing Agreement. Under the modified agreement, FAMCO was to service Hutton's mortgages pursuant to a program called "Mortgage Backed Security Servicing" (hereinafter "MBS Servicing"). Under such agreement, FAMCO would forward monthly principal and interest payments due on all loans sold to Hutton, whether or not FAMCO had received monthly payments from the borrowers.

As discussed in the *Equitable* Opinion, it is apparent that the MBS Servicing ar-rangement was a key factor in FAMCO's ability to defraud Hutton. *See* the *Equitable* Opinion, *supra,* 678 F.Supp. at 574. MBS Servicing permitted FAMCO to avoid organizing its loan servicing operations which, as Hutton knew, were in considerable disarray. As long as FAMCO continued to pay Hutton the proper monthly amounts due, Hutton had little interest in the accompanying paperwork. In fact, during the time period for which E & W audited FAMCO's financial statements and which ended on February 29, 1984, Hutton had received from FAMCO all the money that it was due. Hutton did not, as it had a right to do, check on the delinquencies of the various mortgages it had purchased, nor did it undertake to verify whether prepayments of mortgages were being forwarded to it by FAMCO as required by the 1983 Servicing Agreement. FAMCO was not, as it was contractually required to do, forwarding monthly delinquency reports which would have revealed the high rate of delinquencies and defaults in the loans purchased by Hutton, nor was FAMCO forwarding to Hutton prepayments being made by borrowers. Hutton imprudently chose to continue to purchase loans in reliance on the fact that it was regularly receiving from FAMCO payments of interest and principal due, whether or not the borrowers were making their required payments.

Claiming that E & W knew of Hutton's agreements with FAMCO, Hutton has asserted three separate claims against partners of E & W in this case. Count I is based on a theory of common law fraud; Count II on a theory of aiding and abetting common law fraud, and Count III on a theory of negligence. In support of those claims, Hutton contends that E & W knew of Clott's fraud and participated in it, that E & W improperly audited FAMCO's financial statements and that the fraud and negligence of E & W caused the losses sustained by Hutton.

## II

### *Summary Judgment Principles*

It is well settled that a defendant moving for summary judgment has the burden of

showing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Rule 56(c), F.R. Civ.P.; *see also Barwick v. Celotex Corp.,* 736 F.2d 946, 958 (4th Cir.1984). This burden may be met by consideration of affidavits, exhibits, depositions and other discovery materials. *Id.*

One of the purposes of Rule 56 is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that a defendant may be liable under the claims alleged. *See* Rule 56(e). Moreover, " '[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick, supra,* 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theaters, Inc.,* 42 F.R. D. 627, 640 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. As Chief Judge Winter said in *Bland v. Norfolk and Southern Railroad Company,* 406 F.2d 863, 866 (4th Cir.1969):

> While a day in court may be a constitutional necessity when there are disputed questions of fact, the function of a motion for summary judgment is to smoke out if there is any case, *i.e.,* any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition.

In two recent cases, the Supreme Court has had an opportunity to clarify and expand the principles applicable to a trial court's consideration of a summary judgment motion filed under Rule 56. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 267 (1986).

In *Anderson,* the Supreme Court held that the standard for granting a summary judgment motion under Rule 56 is the same as that for granting a directed verdict under Rule 50, F.R.Civ.P. 477 U.S. at 250–51,

106 S.Ct. at 2511. The Court explained this standard as follows:

> [T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;* there must be evidence on which the jury could reasonably find for the plaintiff.

*Id.* at 252, 106 S.Ct. at 2512 (emphasis added).

In *Catrett,* the Court held that there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). In reaching this result, the Court observed:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule.Civ.P. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984).... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555.

The Fourth Circuit recently discussed in *Felty v. Graves–Humphrey Co.,* 818 F.2d 1126 (4th Cir.1987), the Supreme Court's holdings in *Anderson* and *Catrett.* Judge Wilkinson emphasized in *Felty* that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial."

*Id.* at 1128 (quoting *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court concludes that defendants' motion for summary judgment must be granted.

### III

#### Hutton's Claims

Count I of the complaint seeks a recovery under a theory of common law fraud. To prove its claim of fraud under Maryland law,[5] plaintiff must establish by clear and convincing evidence: (1) that E & W made a false representation to plaintiff; (2) that E & W knew that the representation was false or made the representation with such reckless indifference to the truth as to impute knowledge and an intent to defraud; (3) that the representation was made for the purpose of deceiving plaintiff; (4) that plaintiff reasonably relied upon E & W's false representation; and (5) that plaintiff suffered damage resulting directly from E & W's fraudulent representation. *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982).

Count II of the complaint seeks a recovery under a theory of aiding and abetting common law fraud. Defendants contend that Maryland does not recognize the tort of aiding and abetting common law fraud and that in any event no evidence exists to support such a claim. In the *Equitable* Opinion, this Court said the following:

> Relying upon cases decided under securities laws, Hutton contends that it need prove merely three elements to sustain under Maryland law the claim asserted in Count VIII, as follows: (1) primary fraud by the principals; (2) the aider's knowledge or reckless disregard of the possibility of primary fraud; and (3) the aider's substantial assistance of the primary fraud. *See Martin v. Pepsi–Cola Bottling Co.,* 639 F.Supp. 931, 934 (D.Md. 1986). Even were this Court to assume that *Martin* applies to claims based on common law fraud as well as to claims based on securities fraud, there is no

> evidence in the record [to substantiate this claim].

The *Equitable* Opinion, *supra,* 678 F.Supp. at 580.

Count III of the complaint seeks a recovery under a theory of negligence, which in this case may alternatively be described as a claim of accountant malpractice. To establish a cause of action of negligence under Maryland law, plaintiff must prove the existence of four elements: (1) a duty owed to it; (2) a breach of that duty; (3) a legally cognizable causal relationship between the breach of duty and the harm suffered; and (4) damages. *Jacques v. First National Bank,* 307 Md. 527, 531, 515 A.2d 756 (1986).

### IV

#### Summary Judgment is Appropriate

#### As to Each of Plaintiff's Claims

On the record here, this Court finds and concludes that summary judgment should be granted in this case as to all counts of the complaint. First, with respect to plaintiff's claim of fraud, there is no clear and convincing evidence that defendants committed any fraudulent acts. Second, even assuming that Maryland recognizes the tort of aiding and abetting fraud, there is no evidence in this case to support such a claim. Third, plaintiff cannot prove in this case that its losses were directly caused by defendants' allegedly tortious conduct. Moreover, plaintiff's own negligence was a contributing cause of its losses. Other contentions advanced by defendants need not be discussed herein.

The Court is not writing on a clean slate in this case. The relationship between Hutton and FAMCO was thoroughly explored in the *Equitable* Opinion. Exhaustive discovery in this case has further focussed on the work that E & W did for FAMCO and on the ill-advised decisions made by Hutton's management in continuing to do business with FAMCO when prudent steps would have revealed FAMCO's fraudulent activity.

---

5. The parties agree that Maryland law governs    plaintiff's claims in this case.

In the *Equitable* case, Hutton contended that Equitable, FAMCO's banker, knew of FAMCO's fraud and participated in it. Here similar claims are asserted against FAMCO's accountant. As in the *Equitable* case, the facts of record here do not support those claims. Clott was able to fool not only Hutton and Equitable but also E & W. Each of these parties was defrauded by Clott, but none of them knew of the fraud being committed nor did any of them participate in it. Indeed, the many civil actions filed in this Court graphically portray Clott's ability to deceive many persons and entities with whom or which he did business including banks, savings and loan institutions, lawyers, auditors and investors.[6] As in the *Equitable* case, Hutton's attempts in this case to recoup its losses from another party doing business with FAMCO must fail.

#### (a)

#### *Fraud*

■ Viewed in a light favorable to the plaintiff, evidence indicating actionable fraud on the part of E & W simply does not exist in this case. In an attempt to substantiate its claim of misrepresentation, Hutton contends that E & W falsely represented "that [it] had examined FAMCO's 1984 financial statements in accordance with GAAS [Generally Accepted Auditing Standards], and that the statements fairly presented FAMCO's financial position in accordance with GAAP [Generally Accepted Accounting Principles]." This is a specious contention, amounting to no more than a rephrasing of plaintiff's negligence claim. If an accounting firm could be charged with fraud every time that its audit did not conform to generally accepted accounting principles, then every claim of malpractice would also constitute a claim of fraud. There is no evidence in this record to indicate that the work done by E & W was recklessly performed or undertaken with an intent to deceive Hutton.

Hutton argues that Clott's diversion of funds from FAMCO to M.H. Mortgage was

so obvious that E & W's failure to discover it must have been fraudulent. However, Note H of E & W's audit report specifically referred to various related party transactions of FAMCO and disclosed facts indicating substantial unsecured loans to Clott and corporations controlled by him. In pertinent part, Note H provided as follows:

NOTE H—RELATED PARTY TRANSACTIONS

The Company makes advances to, or for the benefit of, the principal stockholder of the Company. During fiscal year 1984 the Company had advanced $399,-252, all of which was outstanding at February 29, 1984. These advances are unsecured, payable on demand and bear no interest.

The Company also makes unsecured cash advances to, or on behalf of, First American Mortgage Servicing Company, Inc. ("the Servicing Company"), an affiliated company, which are payable on demand, on an interest-free basis. The amount of such advances made during the year, all of which had been repaid as of February 29, 1984, amounted to $545,301. The Servicing Company, which is owned by the stockholders of the Company, provides the servicing for all mortgage loans held for investment and resale at no charge.

\* \* \* \* \* \*

As of February 29, 1984, the Company had notes receivable from affiliates of $289,440. Of this amount, $100,000 is due from an affiliated company of which the principal stockholder of the Company is a stockholder. This note receivable bears interest at 18% per annum, is unsecured and is payable on demand. In addition, $175,000 is due from another stockholder of this affiliated company. This note receivable bears interest at the prime rate of interest, is unsecured and is payable on demand.

On November 15, 1982, the Company purchased certain assets of an affiliated company which was wholly-owned by the

---

**6.** Footnote 1 of the *Equitable* Opinion lists civil actions filed in this Court by persons or entities defrauded by Clott. Additional pending cases of

this sort include *Stratton v. Sacks,* Civil No. H–88–614; *Stratton v. Clott,* Civil No. H–88–779; *Stratton v. Equitable Bank,* Civil No. H–88–1485.

principal stockholder of the Company. The assets acquired from this affiliated company included, among others, all the outstanding capital stock of Nationwide Mortgage Company, Inc. (Nationwide). As a result of this transaction, Nationwide became a wholly-owned subsidiary of the Company. The cost of the Company's purchase of the assets of the affiliated company was in excess of their fair value by $756,184 which was recorded as cost in excess of net assets acquired in the accompanying financial statements. As partial consideration for this purchase, the Company issued a $910,000 note payable to the principal stockholder which bears interest at 10% per annum. The principal amount will be repaid in three annual installments after the total stockholders' equity of the Company exceeds $2,000,000.

Hutton also makes much of E & W's failure to discover that FAMCO failed to remit borrower prepayments to the owners of the loans in a timely manner. However, E & W accounted for the prepayments in a category entitled "Due to purchasers of mortgage loans receivable." Whether or not E & W's description of the prepayments was sufficiently specific, it can hardly be considered fraudulent.

Hutton further argues that it was deceived by E & W during direct communications between Hutton and E & W in 1984. When E & W learned of the 1983 Servicing Agreement between FAMCO and Hutton, E & W became concerned that FAMCO's disorganized servicing operation was not in compliance with the terms of the Agreement. Accordingly, E & W contacted Hutton and asked Hutton whether it would waive any defaults by FAMCO in failing to comply with provisions of the 1983 Servicing Agreement. Hutton consented to waive any such defaults. Hutton now contends that it was deceived by E & W, because E & W did not reveal to it the full extent of FAMCO's servicing problems. Evidence in this record does not support the contention that any such failure on the

part of E & W amounted to fraud. Rather, as discussed hereinafter, the record in this case indicates that Hutton already knew that FAMCO was not complying with the 1983 Servicing Agreement. Hutton had already decided not to take action in response to FAMCO's failure to comply with the terms of the Agreement, and Hutton accordingly was willing to waive FAMCO's defaults.

In sum, from the fact that E & W had no motive whatsoever to defraud Hutton, from the fact that E & W's audit report did reveal FAMCO's poor financial condition, and from the total lack of evidence indicating that E & W acted recklessly or with an intent to defraud Hutton, it is clearly apparent that Hutton's claim of fraud lacks merit.[7]

(b)

*Aiding and Abetting Fraud*

Count II of Hutton's complaint is based on the theory that E & W aided and abetted Clott's fraud. E & W makes two arguments in seeking summary judgment as to this claim: first, that Maryland does not recognize the tort of aiding and abetting common law fraud; and second, that there is no evidence in the record to support the claim.

Whether or not Maryland recognizes the tort of aiding and abetting common law fraud, this claim cannot in any event survive the pending motion for summary judgment. There is no evidence in the record that E & W during the times at issue knew about Clott's fraud nor that it knowingly aided and abetted such fraud. To succeed on this claim, Hutton must prove that defendants knowingly or recklessly participated in Clott's fraud. *See* the *Equitable* Opinion, *supra*, 678 F.Supp. at 586. As in the *Equitable* case, evidence to support this claim simply does not exist in this record. Accordingly, summary judgment must likewise be entered in favor of

---

7. Furthermore, even if there were evidence of fraud in this record, such fraud was not the proximate cause of Hutton's losses. *See Lustine*

*Chevrolet v. Cadeaux,* 19 Md.App. 30, 308 A.2d 747 (1973).

defendants as to Count II.[8]

### (c)
### *Proximate Cause*

■ In Count III of the complaint, plaintiff Hutton asserts that it is entitled to recover substantial damages from E & W because this accounting firm negligently performed its audit of FAMCO's financial statements and because such negligence proximately caused the losses sustained by Hutton. It is not necessary for this Court to consider whether there is sufficient evidence in the record for the Court to submit to the jury the question whether E & W negligently violated generally accepted auditing standards in performing its audit of FAMCO's financial statements during the period from early March until late August of 1984. Assuming that E & W owed a duty of care to Hutton,[9] and further assuming that E & W was negligent, this Court finds and concludes that any such negligence was not the proximate cause of the losses claimed by plaintiff in this suit. Hutton's losses were caused by Clott's fraudulent conduct and by Hutton's own negligence.

In order to substantiate its claim of negligence asserted in this case, Hutton must prove not only negligence on the part of E & W but also that Hutton's losses directly resulted from E & W's tortious conduct. Under Maryland law, an issue of proximate cause is ordinarily one to be resolved by the jury. *Suburban Trust Company v. Waller,* 44 Md.App. 335, 347, 408 A.2d 758 (1979). However, where the evidence adduced would admit of but one conclusion, the matter may be decided by the court as a matter of law. *Id.; Owens v. Simon,* 245 Md. 404, 408–09, 226 A.2d 548 (1967). From its review of the extensive record in

this case, this Court has concluded as a matter of law that plaintiff cannot prove that defendants' conduct directly caused plaintiff's damages. Thus, the issue of causation can be determined by this Court at this stage of the proceedings.

Hutton contends that it has established a triable issue of fact as to the existence of proximate cause in this case based on the following argument:

> Defendants' audit report gave FAMCO's operations an accounting stamp of approval. On this basis Hutton agreed to significantly expand its business relationship with FAMCO. Had the Opinion been qualified (or disclaimed) to disclose that FAMCO's servicing records were in chaos, or had the financial statements been fairly presented to reflect FAMCO's ongoing transfer of monies to M.H. Mortgage, Hutton would have terminated its relationship with FAMCO in August 1984.

Contrary to Hutton's contentions, however, the very full record in this case indicates that Hutton's losses were caused essentially by Clott's fraudulent conduct and by its own lack of prudence, but not by any tortious acts of E & W. *See* the *Equitable* Opinion, *supra,* 678 F.Supp. at 571. It should first be emphasized that defendants' audit report made no mention whatsoever of the investment *quality* of FAMCO mortgage loans. Hutton's losses were caused essentially by the poor quality of the mortgage loans it purchased, by the fact that the loans were not properly serviced, and by fraudulent conduct of FAMCO.[10] Hutton did not invest in or loan money to FAMCO, but merely purchased a substantial number of mortgage loans from it. Defendants' audit report was relevant to

---

8. Hutton has further not proved that any participation by E & W in Clott's fraudulent activities proximately caused its losses. *See Lustine, supra.*

9. Relying on *Jacques v. First National Bank, supra,* defendants argue that they owed no duty of care to Hutton. In view of the Court's determination of the issue of proximate causation, it will be assumed that there is sufficient evidence in the record of a nexus between Hutton and E & W constituting the equivalent of privity for

the Court to have submitted that question to the jury. *See Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 438, 483 N.E.2d 110 (1985).

10. As discussed in the *Equitable* Opinion, many mortgages were double sold, and in addition FAMCO did not remit prepayments of mortgages to Hutton as required by the agreements between the parties. *See* 678 F.Supp. at 572.

FAMCO's financial stability, but did not relate to the investment quality of FAMCO-originated loans.

Moreover, even if negligently prepared in some respects, defendants' fiscal year 1984 audit report of FAMCO clearly showed that FAMCO was a financially weak company. In fact, a study undertaken in 1985 of these audited financial statements of FAMCO by New York executives of the parent of E.H. Hutton Group, Inc.[11] concluded that FAMCO had a negative tangible net worth. As noted in the *Equitable* Opinion, Andrew Selden had instructed the Internal Audit Division of the Hutton companies (the "IAD") to investigate the activities of their subsidiary (plaintiff Hutton) and its dealings with FAMCO. *See* the *Equitable* Opinion, 678 F.Supp. at 584. Executives of the parent of Hutton Group recommended, *inter alia*, that plaintiff Hutton not engage in any credit sensitive business with FAMCO. E & W's fiscal 1984 audit report of FAMCO on its face thus did not paint a misleadingly rosy picture of FAMCO's financial condition. Indeed, close attention to Note H of the audit report would have disclosed glaring weaknesses in FAMCO's financial structure. As indicated by Note H, in 1984 FAMCO had made unsecured, interest-free advances to Clott in the amount of $399,000; FAMCO held unsecured notes receivable from affiliates in the amount of $289,000 and FAMCO had in 1982 purchased assets of an affiliated company owned by Clott at a cost which was in excess of the assets' fair value by $756,000. (*See* Note H, *supra* at 14.) These and other facts of record here convince this Court that plaintiff cannot establish that its losses were caused by its mistaken belief that FAMCO was a financially stable company.

Hutton's contention that it expanded its business relationship with FAMCO based on the mistaken belief that FAMCO did not engage in related party transactions is similarly without merit. As discussed hereinabove, Note H details numerous related party transactions, including unsecured, interest-free advances to Clott. Knowing what was disclosed to it by Note H, Hutton can hardly now contend that it would have decided to terminate its business relationship with FAMCO if more specific or supplemental information had been furnished concerning FAMCO's related party transactions.

Hutton's assertion that it would have terminated its business relationship with FAMCO in August of 1984 had it known "that FAMCO's Servicing records were in chaos" is likewise without merit. Contrary to this argument, evidence in this record shows that Hutton in fact knew in August of 1984 that FAMCO's servicing records were in total disarray. Indeed, even at the time of Hutton's first purchase of FAMCO mortgage loans in January of 1984, Hutton knew that FAMCO's servicing capabilities were either *de minimis* or nonexistent. When Mueller was asked at his deposition if he could recall the status of FAMCO's servicing operations in January of 1984, he responded "I knew [their servicing operation] didn't exist."

Mueller in fact knew that from January of 1984 through late August or early September of 1984 FAMCO's servicing and record-keeping was so deficient that it could not even tell Hutton which of its mortgage loans were delinquent. Representatives of Hutton visited FAMCO's offices in April of 1984 and observed that its servicing capabilities were deficient. James Benedum, a Senior Vice President of Hutton, described FAMCO's office as a "mad house." However, at the time, Clott assured Mueller that the servicing operation would soon function properly. Mueller accepted and relied on these assurances as he had on other misrepresentations made to him by Clott, and Mueller consequently decided to continue to expand Hutton's purchase of FAMCO mortgage loans. Mueller later returned to FAMCO's offices in August of 1984 and once again saw that its servicing capabilities continued to be deficient. During his deposition, Mueller de-

---

**11.** E.F. Hutton Group Inc. was the parent corporation of plaintiff E.F. Hutton Mortgage Corporation.

scribed FAMCO's servicing in August of 1984 as follows:

they could show you a bunch of computer printouts, but they were garbage at that point insofar as the information. It still was not intelligible.

In sum, when in late August or early September 1984 Hutton received a copy of FAMCO's audited financial statements for the fiscal year ending February 29, 1984, Hutton already knew that FAMCO's servicing operation was severely deficient. In spite of the abundant evidence in this record that Hutton had knowledge of deficiencies in FAMCO's servicing operations, Hutton contends in opposing the pending motion for summary judgment that its damages were proximately caused by E & W's failure "to disclose that FAMCO's servicing records were in chaos." This contention is clearly without merit.

The damages claimed by Hutton in this case were not proximately caused by tortious acts of E & W. Rather, Hutton's losses were caused by Clott's fraud and by its own ill-advised business decisions. Knowing that FAMCO's servicing of the mortgages was severely deficient, Hutton, under the MBS Servicing arrangement, continued to receive from FAMCO on a monthly basis all of the principal and interest that was due. Given the high rate of interest that Hutton was receiving on these loans, and given Clott's assurances to Hutton that the loans were insured and not delinquent in large numbers, Hutton had no desire to terminate what it then believed was an extremely profitable business relationship with FAMCO. The E & W audit played no essential part in Hutton's decision to continue to purchase FAMCO-originated mortgage loans.

Plaintiff Hutton argues that more than one wrongful act can proximately cause loss or injury and that it is a jury question whether a combination of defendants' negligence and Clott's fraud proximately caused Hutton's losses. *See First Federal*

*Savings & Loan Association of Brainerd, et al. v. Equitable Bank, National Association*, Civil Nos. H–86–301 and H–86–3531 (Memorandum and Order of April 5, 1988 at 12–13). This Court would agree that there may be more than one wrongful act which can proximately cause or contribute to damages sustained by a plaintiff. Indeed, in this particular case there were in fact two legally sufficient causes, namely Clott's fraud and Hutton's contributory negligence. However, any negligence of defendants did not directly cause the losses claimed in this case by Hutton.[12]

In *First Financial Federal Savings & Loan Ass'n v. E.F. Hutton Mortgage Corp.*, 652 F.Supp. 471, 474 (W.D.Ark.), *aff'd* 834 F.2d 685, 687 (8th Cir.1987), plaintiff Hutton successfully defended a suit brought against it by an investor which claimed to have suffered losses caused by Hutton's misrepresentations. In affirming the District Court's granting of summary judgment in favor of Hutton, the Eighth Circuit stated that a sophisticated investor would not be entitled to claim that it reasonably relied on misrepresentations of Hutton when "it could have discovered the true nature of the mortgages by exercising ordinary diligence." 834 F.2d at 687. Similarly, in this case, Hutton as a sophisticated business entity can hardly claim losses allegedly resulting from its reliance on the audit reports when ordinary diligence on its part would have caused it to stop buying mortgage loans from FAMCO.

(d)

*Contributory Negligence*

■ Maryland is one of a minority of states in the nation which has not adopted the comparative fault doctrine. Under Maryland law, contributory negligence is an all-or-nothing proposition which completely bars recovery of damages by a person whose fault contributes to that damage, no matter how slight that fault may be. *See, e.g., Jennings v. United States*, 178 F.Supp. 516, 526 (D.Md.1959), *vacated on*

---

12. The facts of the *First Federal* case were quite different from those present here. There, defendant Equitable had entered into a three-party Custodial Agreement with the plaintiffs and FAMCO. Sufficient evidence existed that Equitable's breach of contract was a contributing cause of the losses sustained by the plaintiffs for the Court to submit that question to the jury.

*other grounds,* 291 F.2d 880 (4th Cir.1961); Digges & Klein, *Comparative Fault in Maryland: The Time Has Come,* 41 Md.L. Rev. 276 (1982). Thus, any negligence of plaintiff Hutton which directly contributed to its losses will bar a recovery in this case regardless of its ratio or proportion as contrasted with the negligence of defendants. *Jennings, supra* at 526.

In the *Equitable* Opinion, this Court found on the record then before it that Hutton's losses were caused in part by ill-advised business decisions made by it and that Hutton was aware of FAMCO's bookkeeping deficiencies at an early date but failed to take prudent steps to protect itself from loss. 576 F.Supp. at 572–73, 577–79. The record in this case supplies even more evidence indicating that Hutton's losses were caused both by Clott's fraudulent activity and by a lack of prudence on the part of Hutton's executives. Indeed, these two causes are interrelated. Had Hutton acted prudently, it would have discovered Clott's fraud at an early date, certainly by early September of 1984.

The mortgage loans purchased by Hutton obviously were extremely risky investments. These were second and third mortgages with interest rates of 18% per annum. Fees charged by FAMCO at the outset amounted to 20–30% of the face amount of the loan. Hutton therefore knew that these were high risk loans made to desperate borrowers by a lender of last resort. Before accepting these loans in its portfolio, Hutton had every opportunity to review all the loan papers and decide whether or not each loan should be purchased.

Under these circumstances, Hutton had to know that delinquencies might be expected and that it would be necessary in order to protect its investment to take prompt and decisive action if loans became delinquent. Moreover, if FAMCO-originated loans continued to have high delinquency rates, Hutton, had it acted prudently, would have discontinued purchasing them.

Unaccountably, Hutton did not, as it had a right to do under the 1983 Servicing Agreement, demand and receive delinquency reports. Rather, it relied instead on the fact that monthly payments were being received from FAMCO or its subsidiary FAM Mortgage Servicing, Inc. As this Court has noted in this Opinion and as it previously noted in the *Equitable* Opinion, the MBS Servicing arrangement was a key factor in FAMCO's ability to defraud Hutton.

Proper investigations were not even undertaken by Hutton at the outset to determine whether a particular borrower was a poor credit risk. Some loans were accepted even though an inspection of the loan files would have indicated that the borrower could hardly be expected to make timely payments of principal and interest due. With such high risk loans in its portfolio, it was particularly important that Hutton closely monitor delinquency rates. Yet it took no steps to enforce its contractual right to have FAMCO report on delinquencies. Nor did it seek to verify whether it was receiving prepayments from FAMCO. When FAM Servicing took over the servicing of the loans, Hutton, after being contacted by E & W, even waived audit of FAM Servicing and its operations.

The full picture of Hutton's lack of prudence emerged when Selden of the parent's New York office undertook his investigation in early 1985 of Mueller's handling of FAMCO-related transactions.[13] In the *Equitable* Opinion, this Court discussed what was discovered as a result of this investigation, as follows (678 F.Supp. at 584):

> As of January 1985, Hutton owned a large inventory of FAMCO originated loans. Beginning in early 1985, a review of Hutton's operations was ordered by executives of the parent of Hutton Group. This review was led by Andrew Selden. Selden learned in early 1985 that the paperwork accompanying the FAMCO originated loans was in total disarray. Selden concluded that there were significant business risks associat-

---

**13.** Hutton did not send the E & W audit report to New York management personnel when it was received in late August or early September of 1984. Rather, the report was not seen by Selden and other executives until early 1985.

ed with Hutton's resale of FAMCO originated loans to Hutton customers.

Selden instructed the Internal Audit Division of the Hutton companies (hereinafter the "IAD") to investigate the activities of its subsidiary Hutton in an effort to determine whether FAMCO was complying with the terms of the FAMCO–Hutton agreement. The IAD discovered that FAMCO was not complying with the terms of the agreement. In particular, IAD learned in February of 1985 (1) that FAMCO possibly was not making its required deposits to the SIRF escrow account, (2) that insurance certificates were missing from many of the FAMCO originated loan files, and (3) that various other irregularities existed with respect to FAMCO originated loans.

It is apparent from the record in this case that most of what the IAD discovered in early 1985 was readily ascertainable by Hutton at an earlier date. Had Hutton acted prudently before continuing to purchase FAMCO-originated loans, it would have discovered in 1984 the facts revealed by the IAD in early 1985 and would have reached the decision to decrease and eventually terminate its business relationship with FAMCO much earlier than it did.

Selden reported to his superiors that "a major problem" existed and that this was "a very messy situation." Arthur Mueller, President of E.F. Hutton Mortgage Corporation, was held responsible, and Selden concluded that Mueller had been an "incompetent President." In June of 1985, Mueller was fired.

These and other facts in the record lead to the conclusion that as a matter of law Hutton was itself negligent and that its own negligence was a contributing cause of the losses sustained by it. Even were a jury to find that E & W negligently performed its audit work between March and April of 1984, plaintiff would not be entitled to a recovery in this case because of its own contributory negligence.

## V

### *Sanctions*

■ Defendants have moved for the imposition by this Court of sanctions upon plaintiff Hutton and its counsel under Rule 11, F.R.Civ.P., because plaintiff has improperly charged E & W with fraud. Defendants contend that Hutton's attorneys did not have a good faith basis for alleging fraud in the complaint and further that they did not act in good faith in opposing that portion of defendants' motion for summary judgment addressed to the fraud counts. Although the question is a close one, this Court has concluded on the record before it that defendants' motion for sanctions should be denied.

In the *Equitable* Opinion, this Court concluded that both sides had violated Rule 11 by pressing their RICO claims. However, since each side was equally at fault, no sanctions were imposed. In the *Equitable* case, each side had been specifically warned that sanctions would be imposed if it became apparent later in the case that the RICO claims had been pursued for an improper purpose. In this case, no RICO claim was asserted by plaintiff, and no previous warning was given by the Court insofar as the fraud claims were concerned.

The question before the Court is whether the Rule 11 requirement of a reasonable pre-filing inquiry was made by counsel for plaintiff and whether it was reasonable for counsel to continue to oppose that portion of defendants' motion for summary judgment which was addressed to the fraud claims after the motion had been filed. *See Wagner v. Allied Chemical Corp.*, 623 F.Supp. 1407, 1411–12 (D.Md.1985).

On the record here, this Court cannot conclude that it was unreasonable for Hutton's attorneys to believe that the fraud allegations were well grounded in fact. Nor can this Court conclude that it was unreasonable for Hutton's attorneys to continue to oppose defendants' motion for summary judgment after it was filed. Certainly, there was no evidence whatsoever of any specific fraudulent intent on the part of E & W or any of its partners. This Court has further found as a matter of law that E & W was not reckless in the audit work performed by it. However, the find-

ing of no recklessness could not be made until all the facts were carefully sifted and until it became readily apparent that E & W (as well as Hutton and Equitable) had been defrauded by FAMCO. The facts here were complex and were further complicated by Clott's ongoing fraud. Even though this Court has concluded that there is no merit to plaintiff's claims of fraud, the Court cannot conclude on this record that it was unreasonable for Hutton's attorneys to press them. For these reasons, defendants' motion for sanctions will be denied.

## VI

### Conclusion

For the reasons stated, defendants' motion for summary judgment will be granted as to all counts of the complaint. Defendants' motion for sanctions will be denied. Judgment will accordingly be entered in favor of defendants, with costs. An appropriate Order will be entered by the Court.